

**FILED**

Sep 25 2019, 5:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kurt McElroy,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 25, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2930<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Mark D. Stoner, Judge<br><br>The Honorable Jeffrey L. Marchal, Magistrate<br><br>Trial Court Cause No.<br>49G06-1711-F4-43515 |

**Barteau, Senior Judge.**

## Statement of the Case

[1] Kurt McElroy brings this interlocutory appeal from the trial court's denial of his motion to suppress. We affirm.

# Issue

[2] McElroy presents one issue for our review, which we restate as whether the search of his home violated his federal and state constitutional rights.

# Facts and Procedural History

[3] Demarqus Whitley, McElroy's step-son, was placed on home detention through Marion County Community Corrections (MCCC) in October 2017. Several of the community corrections program conditions to which Demarqus agreed provide:

> If you do not own, rent or lease the residence in which you reside, you must advise the owner(s) of the residence of the conditions of Electronic Monitoring.

> You must not possess alcohol or non-prescribed drugs on your person, in your residence or in your property at any time. The residence in which you are residing must be alcohol and non-prescribed drug-free as well. If other residents fail to comply, you will be required to move.

> You waive your right against search and seizure, and shall permit MCCC staff, or any law enforcement officer acting on a [sic] MCCC's behalf, to search your person, residence, motor vehicle, or any location where your personal property may be found, to insure compliance with the requirements of community corrections.

> You must not use, purchase or possess weapons, firearms, or ammunition. Any weapons, firearms, or ammunition found in the residence where you reside will be confiscated and will result in the immediate filing of a Notice of Violation with the Court.

> There are to be no weapons in the residence regardless if any residents have a valid weapon permit.

Ex. Vol., State's Ex. 1, p. 4. While Demarqus was participating in the program, he resided at the home of his mother, Tamika Whitley, and her husband, McElroy. The living arrangements were such that Demarqus slept on the couch in the living room, kept his belongings next to the couch and in a closet in the living room, and used the downstairs bathroom.

[4] On November 7, 2017, Jill Jones, law enforcement liaison with MCCC, and several police officers conducted a home visit to ensure Demarqus' compliance with his home detention conditions. At the door of the residence, Jones explained to McElroy and Demarqus that she was there to perform a home visit. Immediately upon entering the residence, Jones and the officers smelled the odor of burnt marijuana. The officers then began to perform a routine sweep of the house for safety. While performing the protective sweep, the officers observed a green leafy substance, thought to be marijuana, in plain view on the half wall of the staircase.

[5] The officers also encountered a locked bedroom door upstairs. They asked for the key to unlock the door but were informed that it was the bedroom of an older daughter who had the key and was at work. Tamika told the officers that no one was in the bedroom and that they could kick in the door if necessary, but the officers declined to do so. McElroy assisted the officers by using some tools to unlock the door, and the officers were then able to check the room for safety purposes.

[6]     As the officers were performing the safety sweep, Tamika recorded video footage on her cell phone, which was later transferred to a flash drive and admitted as an exhibit at the suppression hearing. Tamika can be heard on the video stating that Demarqus lives in the front room, that all of his belongings are downstairs, and that the area of the couch is "his area." Ex. Vol., Defendant's Ex. D. At the suppression hearing, she testified that she told Jones and the officers they could search Demarqus' "area." Tr. Vol. II, p. 49.

[7]     Upon completing the protective sweep, two officers were in the kitchen discussing how to proceed given the odor of the burnt marijuana and the discovery of the marijuana leaves. At that time, one of the officers discovered a handgun on top of a kitchen cabinet. McElroy told the officers that the gun was his. Following the discovery of the handgun, one of the officers spoke with Tamika, and she signed a consent to search. The officers performed a search of the house, during which they found a bag of marijuana in a dresser drawer in the master bedroom.

[8]     Based upon these events, the State charged McElroy with unlawful possession of a firearm by a serious violent felon, a Level 4 felony,[1] and possession of marijuana, a Class A misdemeanor.[2] McElroy filed a motion to suppress, and,

---

[1] Ind. Code § 35-47-4-5 (2017).

[2] Ind. Code § 35-48-4-11 (2017).

following a hearing, the trial court entered its findings and order denying the motion. This interlocutory appeal ensued.

## Discussion and Decision

[9]     McElroy contends the trial court erred in failing to suppress the handgun found in the kitchen and the bag of marijuana found in the master bedroom because these items were seized as a result of a warrantless search that violated his federal and state constitutional rights. The State argues that, because Demarqus gave his consent for a search of his residence and agreed to inform the owners of his residence of his home detention conditions, the officers had authority to search McElroy's residence.

[10]    We review the denial of a motion to suppress similar to other sufficiency matters. *Primus v. State*, 813 N.E.2d 370, 373 (Ind. Ct. App. 2004). When reviewing a trial court's denial of a defendant's motion to suppress, we examine whether substantial evidence of probative value exists to support the court's decision. *Berry v. State*, 121 N.E.3d 633, 636-37 (Ind. Ct. App. 2019), *trans. denied*. We neither reweigh the evidence nor judge the credibility of witnesses; rather, we consider the evidence most favorable to the ruling together with any adverse evidence that is uncontradicted. *Primus*, 813 N.E.2d at 373. Nevertheless, the constitutionality of a search or seizure is a question of law, which we review de novo. *Wertz v. State*, 41 N.E.3d 276, 279 (Ind. Ct. App. 2015), *trans. denied*.

# A. Handgun

## *1. Fourth Amendment*

[11]     The Fourth Amendment to the United States Constitution protects people from unreasonable search and seizure. U.S. CONST. amend. IV. A search warrant is generally a prerequisite to a constitutionally proper search and seizure. *Halsema v. State*, 823 N.E.2d 668, 676 (Ind. 2005). When a search is conducted without a warrant, the burden is on the State to prove that an exception to the warrant requirement existed at the time of the search. *Id.* One such exception is a valid consent to search. *Primus*, 813 N.E.2d at 374. Our Supreme Court has specifically recognized an exception to the warrant requirement in a search of the residence of a probationer or community corrections participant where the probationer or participant has in advance, by valid consent or term in conditions of release, authorized a warrantless, suspicionless search. *State v. Vanderkolk*, 32 N.E.3d 775, 780 (Ind. 2015).

[12]     As set out above, Demarqus' home detention conditions contained a waiver of his right against search and seizure of his person and residence to ensure his compliance with the requirements of his home detention. McElroy does not contest the validity of that waiver as it applies to Demarqus. However, the residence in which Demarqus was staying was not his residence; rather, the residence belongs to McElroy and Tamika, and neither of them were on probation or home detention or had signed a search waiver. Thus, McElroy argues that Demarqus' search waiver does not provide the authority for a search of McElroy's residence. Consequently, we must examine the privacy rights of

individuals who have a community corrections[3] participant living in their residence.

[13]     It is well-established in this state that consent to search may be given by a third party who has common authority over the premises. *Walker v. State*, 986 N.E.2d 328, 334 (Ind. Ct. App. 2013), *trans. denied*.

> Common authority rests on the mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his or her own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* (quoting *Hill v. State*, 825 N.E.2d 432, 436 (Ind. Ct. App. 2005)). On this specific issue, a leading Fourth Amendment treatise instructs:

> If the probationer or parolee is sharing living quarters with someone else not on conditional release, the search may nonetheless extend to all parts of the premises to which the probationer or parolee has common authority. "A warrantless search of a parolee may result in an invasion of privacy, at least to some extent, for those living with the parolee. If the Fourth Amendment rights of nonparolees living with parolees were not reduced, a parolee could avoid all warrantless parole searches by living with a nonparolee and asserting the nonparolee's

---

[3] Although Demarqus was on home detention through the community corrections program, our decision applies equally to community corrections participants and probationers. *See, e.g.*, *Vanderkolk*, 32 N.E.3d at 780 (treating community corrections participants and probationers the same in holding that "[a] probationer or community corrections participant may, pursuant to a valid search condition or advance consent, authorize a warrantless premises search without reasonable suspicion").

constitutional rights, and thus emasculate one significant feature of the parole system."

5 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 10.10(d) at 556-57 n.138 (5th ed. 2012) (quoting *State v. Johnson*, 748 P.2d 1069, 1073 (Utah 1987), *abrogated on other grounds*).

[14] As indicated by the excerpt above, consideration must also be given to the objectives of our conditional release system. Community corrections programs such as home detention serve as alternatives to imprisonment, and placement in these programs is a matter of grace and a conditional liberty that is a favor, not a right. *Vanderkolk*, 32 N.E.3d at 777. Participation in such programs "involves the conditional release of a prisoner who would otherwise be subject to unrestricted searches" during his incarceration and is conditioned upon compliance with certain terms or conditions. *Id.* at 779. Accordingly, supervision of participants, including searches, is necessary to ensure compliance with the terms and to promote legitimate government interests. *Id.* The United States Supreme Court has repeatedly acknowledged that a state has an "overwhelming interest" in "reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees [that] warrant[s] privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson v. California*, 547 U.S. 843, 853, 126 S. Ct. 2193, 2200, 165 L. Ed. 2d 250 (2006).

[15] Many jurisdictions acknowledge that non-participants who share a residence with conditional release participants assume the risk that they will have

diminished Fourth Amendment rights in areas shared with the participant. *See State v. Stanfield*, 554 S.W.3d 1 (Tenn. 2018) (warrantless parole search extended to areas of residence shared by parolee and non-parolees and over which parolee had common authority); *State v. Bursch*, 905 N.W.2d 884 (Minn. Ct. App. 2017) (non-probationer who knowingly lives with probationer has diminished expectation of privacy in areas of residence shared with probationer); *State v. Adams*, 788 N.W.2d 619 (N.D. 2010) (due to terms of probation, non-probationer who chose to live with probationer had reduced expectation of privacy in their shared areas and possessions); *People v. Pleasant*, 19 Cal. Rptr. 3d 796 (Cal. Ct. App. 2004) (persons who live with probationers cannot reasonably expect privacy in areas of residence shared with probationers, including areas within common authority of probationer and fellow occupants and areas that probationer "normally had access"); *State v. Davis*, 965 P.2d 525 (Utah Ct. App. 1998) (where probationer lives with non-probationer, probation searches present considerable peril to non-probationer's Fourth Amendment rights because authority to search probationer's residence extends to areas jointly controlled with other occupants of residence); *Milton v. State*, 879 P.2d 1031 (Alaska Ct. App. 1994) (in case of shared residence, non-probationer retains limited expectation of privacy in his person, possessions, and residence; probation search may extend to all areas of residence over which probationer has control, even if control is not exclusive); and *State v. West*, 517 N.W.2d 482 (Wis. 1994) (non-parolee's reasonable expectation of privacy in apartment she jointly occupied with parolee was limited such that parole search

could extend to all areas and contents in which parolee had common authority).

[16] Here, the evidence at the suppression hearing demonstrates, and the trial court found, that the handgun was not in plain view. However, it was discovered in the kitchen, which McElroy does not dispute was a common area within the home to which Demarqus had access. In fact, the kitchen was adjacent to/attached to the living room where Demarqus was staying. He slept on the couch in the living room and kept his belongings next to the couch and in a nearby closet. Thus, by virtue of Demarqus' community corrections conditions, he consented to searches of his person, residence, and possessions, which includes any areas of the residence over which he had common authority. This was a risk McElroy assumed by allowing Demarqus, a home detention participant, to live with him. Accordingly, McElroy's Fourth Amendment rights were not violated by the officers' search of the common areas of the residence, specifically the kitchen, and the subsequent seizure of the handgun.

### 2. Article 1, Section 11

[17] Like the Fourth Amendment, article 1, section 11 of the Indiana Constitution protects people from unreasonable search and seizure. IN CONST. art. 1, §11. Although the language of Section 11 mirrors the federal protection and appears to have been derived from the Fourth Amendment, we interpret and apply it independently from Fourth Amendment jurisprudence. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004). When evaluating Section 11 claims, we place the

burden on the State to show that the intrusion was reasonable under the totality of the circumstances. *Id.*

[18] Here, we find the search reasonable under the totality of the circumstances. Jones and the officers were present in McElroy's residence for a routine home visit to ensure Demarqus' compliance with the conditions of his home detention, one of which was to abstain from non-prescription drugs and to live in a residence that was free of such substances. As soon as the officers entered the home, they detected the odor of burnt marijuana. In addition, they found marijuana leaves in plain view during the protective sweep of the residence.

[19] Following the protective sweep of the residence, the officers located a handgun in a common area of the home. Demarqus had previously consented to warrantless, suspicionless searches of his person, residence, and possessions. By choosing to reside with Demarqus, McElroy had a limited expectation of privacy in the common areas of the residence. Under these circumstances, it was reasonable for the officers to search the common areas of McElroy's residence based on Demarqus' consent to search.

[20] In summary, we hold that a person who agrees to house a community corrections participant retains a limited expectation of privacy in his residence and possessions. This is so because the participant's person, residence, and possessions are subject to search, including common areas and common possessions. This rationale preserves the State's legitimate interests of supervising participants, protecting the public from criminal acts by reoffenders,

and furthering its rehabilitative objectives. Indeed, without the resulting burden upon the privacy rights of non-participants, community corrections participants would have a substantial motive to reside with a non-participant, thereby thwarting the State's ability to effectively monitor participants and carry out its governmental functions.

## B. Marijuana

[21] Upon finding the handgun, the officers asked Tamika for her consent to a search of the remainder of the house. Tamika signed a consent form, and the subsequent search produced a bag of marijuana from a dresser drawer in the master bedroom upstairs. McElroy claims the marijuana should be suppressed because Tamika's consent to search was the product of the illegal search that produced the handgun. In his brief, he states that Tamika "felt compelled" to sign the consent form once the police discovered the handgun, but he provides no argument or citation to authority regarding the validity of her consent. Appellant's Br. p. 25.

[22] We first note we have determined that the search that lead to the discovery of the handgun was not illegal. Additionally, in its order denying McElroy's motion to suppress, the trial court found that the officers obtained a valid consent to search from Tamika.

[23] As we noted previously, one recognized exception to the warrant requirement is a valid consent to search. *Primus*, 813 N.E.2d at 374. When the State seeks to rely upon consent to justify a warrantless search, it bears the burden of proving

that the consent was freely and voluntarily given. *Bulthuis v. State*, 17 N.E.3d 378, 383 (Ind. Ct. App. 2014), *trans. denied*. The voluntariness of the consent to search is to be determined from the totality of the circumstances. *Crocker v. State*, 989 N.E.2d 812, 820 (Ind. Ct. App. 2013), *trans. denied*.

> The "totality of the circumstances" from which the voluntariness of a detainee's consent is to be determined includes, but is not limited to, the following considerations: (1) whether the defendant was advised of his *Miranda* rights prior to the request to search; (2) the defendant's degree of education and intelligence; (3) whether the defendant was advised of his right not to consent; (4) whether the detainee has previous encounters with law enforcement; (5) whether the officer made any express or implied claims of authority to search without consent; (6) whether the officer was engaged in any illegal action prior to the request; (7) whether the defendant was cooperative previously; and (8) whether the officer was deceptive as to his true identity or the purpose of the search.

*Id.* at 820-21 (quoting *Callahan v. State*, 719 N.E.2d 430, 435 (Ind. Ct. App. 1999)). "A consent to search is valid except where it is procured by fraud, duress, fear, intimidation, or where it is merely a submission to the supremacy of the law." *Bulthuis*, 17 N.E.3d at 383. This determination is a question of fact, and a reviewing court is ill-equipped to make factual determinations, especially where the evidence is conflicting. *Id.*

[24] Although there is no indication that Tamika was advised of her *Miranda* rights or her right to refuse consent, she was not arrested or restrained in any way. Further, Tamika told the officers she is a nurse, and nothing in the record

suggests that she was unable to understand the consent form. At the suppression hearing, Tamika testified that one of the officers told her that if she did not cooperate she would go to jail and that they would get a warrant to search the house. The officers were at the home to assist with a home detention home visit and not engaged in illegal activity prior to asking for Tamika's consent to search. Moreover, the officers were not deceptive as to their identity or the purpose of the search. We conclude that the totality of the circumstances supports the trial court's ruling.

# Conclusion

[25] We affirm the trial court's denial of McElroy's motion to suppress the evidence found during the search of his home.

[26] Affirmed.

Mathias, J., and Bradford, J., concur.